ALONSO. The, (BUSH v.)
[See Bush v. The Alonso, Case No. 2,223.]

## Case No. 257.

### The ALONZO.

[1 Hask. 184.][1]

District Court, D. Maine. Jan. 1869.[2]

SHIPPING — CARRIAGE OF GOODS — UNCERTAIN AMOUNT—BURDEN OF PROOF — BILL OF LADING —DEMURRAGE.

1. Upon the charter of a vessel to carry a cargo of coal at a stipulated price per ton, the bur-

[1][Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]
[2][Affirmed by circuit court. Opinion not reported, and not now accessible.]

den rests upon the carrier to prove the quantity carried, and for that amount he is entitled to freight.

2. The master should tender the shipper customary bills of lading when the cargo is on board.

3. The master is not bound to sign bills of lading stipulating freight on a fixed number of tons where the quantity is uncertain.

4. He should tender the shipper the usual bills of lading specifying the quantity of cargo when uncertain, as more or less.

5. If the shipper refuses to take such bill, the master may deposit the same for him and sail, and upon arrival at the port of destination, after reporting to the consignees, may recover freight and damages, as demurrage, for any delay caused in discharging cargo for want of proper bills of lading to enter the same at the custom-house.

In admiralty. Libel in personam by the owner of the vessel [the Alonzo] against [the Montreal Ocean Steamship Company,] shipper of the cargo, to recover freight and demurrage. The respondent by answer disputed the amount of freight demanded, and denied all liability for demurrage.

Almon A. Strout and George F. Shepley, for libelant.

Edward M. Rand and John Rand, for respondent.

FOX, District Judge. This is a libel instituted by the owner of the barque Alonzo of Halifax, to recover from the Montreal Ocean Steamship Co. the freight on 1,034 tons of coal, brought for said respondent from Pictou to Portland, in Oct. last, at the rate of three dollars per ton, and also for ten days' illegal detention of the vessel at Portland, at the rate of fifty dollars per day. The answer admits the delivery of 955 tons of coal and the price per ton for the freight as set forth in the libel, but alleges that the quantity was to be estimated by the weight as shipped from the mines at Pictou, and that only 955 tons were so delivered, according to the mines' weight, and that they paid for no greater quantity. The evidence, as to the agreement made at Pictou for the transportation of the cargo, is nearly all in depositions, and having carefully read the same, I do not find that any such agreement was made as is stated in the answer, and the owners are not by any contract restricted to the quantity as estimated at the mines. The broker, who effected the charter of the barque on the part of the respondent, states that at the time of the contract nothing was said about the mines' weight. The general rule is, that the carrier is entitled to pay for the quantity received on board and delivered, and that rule must govern in the present case.

It does appear that the coal company at Pictou charged the steamship company for only 955 tons as put on board the Alonzo, but there is no positive testimony from any witness as to the exact quantity in fact shipped. No account is produced of the quantity delivered from day to day to the ship, nor has any one testified positively of his own knowledge of the quantity so put on board, but admitting that the agents of the coal company charged the respondents with only 955 tons, the manner, in which the quantity was arrived at, is not very certain and satisfactory. The agent of the coal company says, there were no large scales for weighing coals at the mines, but that the government furnished the cars for transportation of the coal from the mines to Pictou over the government road, receiving a certain rate per ton for transportation, and also a royalty for the coal per ton. The cars were estimated to contain each five gross tons of coal, when loaded even with the top, and as a test of their capacity, the agent states that he once weighed out on a small scale five tons of coal at the mines, which just filled one of the cars level with the top; that the company is now building a scale for the purpose of weighing coal and other matters; that he saw a large number of the cars loaded with the coal, which was part of the Alonzo's cargo, and that the same were only filled even with the top of the car, and not heaped. There were sixty-one cars employed in transporting the coal from the mines to Pictou. The libellant states in his testimony, that he saw many of the cars so loaded, and that the same were heaped up with coal above the top of the car. It appears that the price of coal was only $2.25 per ton, and that one of the owners of the steamship company is a director in the coal company. Under these circumstances I do not apprehend the agents of the coal company would be very particular and exact in their loading of the cars. At best, this mode of ascertaining the quantity is a mere approximation, and should not be conclusive upon the libellant, but must be weighed in connection with the other evidence in the case, and it is in testimony, that before the barque left Pictou, this estimate was not satisfactory to the libellant, but was disputed by him, he claiming that there was a larger quantity on board, and this claim was admitted to be correct by some of those acting there in behalf of the respondents. The vessel, when she left Pictou, drew 18 1-12 feet of water. On a previous voyage, as testified by the master, he had carried a cargo of this same coal to Boston, the vessel being in the same condition and then drawing only 17 9-12 feet. That cargo, he swears, was all weighed out in Boston, and the vessel delivered 1,050 tons, and there is no contradiction of this testimony.

The Alonzo arrived in Portland on the 25th of October, but did not commence discharging until the 4th of November. The customs officers took an account of the coal as it was delivered, weighing every day sixteen tubs. The whole number of tubs according to the inspector's returns was 7,389, of which 160 were weighed, giving an average of 313½ pounds per tub, making an aggregate of 1,034

tons; and for this amount the libellant claims to recover the freight at $3.00 per ton.

It is claimed by the respondents that this mode of determining the quantity is alike uncertain, and but a mere approximation to the truth. To a certain extent this is so, but after all, it is the mode the government has adopted for ascertaining its duties on articles such as coal, salt, &c. The whole of such cargoes are never weighed by the government officers, but from time to time, tubs full of these articles are weighed, and an average taken, a sufficient number being weighed to insure substantial accuracy. In the present case double the usual number of tubs was weighed. It is well understood, that by this course the importer at least is not defrauded. The customs weigher in this case states, that he always makes a liberal allowance to the importer, deducting from five to ten pounds from the actual weight per tub as indicated by the scale, on account of what may adhere to the tub. The government favors the importer, and does not receive the entire duty on any single pound. I believe no one in purchasing foreign coal would for a moment hesitate to take it at the government weight, rather than have it weighed over by a city weigher.

The minute book kept by the weigher of this and other cargoes of coal received that season by the respondent from Pictou is in evidence; and although the tubs vary in weight, as some tubs were in themselves heavier than others, yet, on the whole, there is not a greater difference than was to be expected, and on looking at the returns of various other cargoes of this coal in this book, I find that the average weight per tub of nine cargoes was 312 1-5 pounds, and of the present cargo was 313½, showing that the weight and account must have been extremely accurate. This mode of determining the quantity of such cargoes, having been thus adopted by the government without any complaint from importers, so far as appears, is to my mind much more satisfactory than that resorted to at Pictou, and when considered in connection with the amount of the other cargo weighed out at Boston, and also the offer proved to have been made by the libellant to the agents of the respondent, to have this cargo of coal all weighed by a city weigher, the respondent to pay the expense if the quantity overrun 955 tons, and the libellant if it fell short, which was declined by the respondent. I can have no doubt that the quantity was in excess of that amount, and well-known to be so by the agent of the respondent. The burden of proof is on the libellant to establish the quantity, and upon a careful examination of all the evidence, I am satisfied that at least 1,034 tons of 2,240 lbs. were delivered to the respondent.

After the vessel was loaded at Pictou, the agents of the respondent proposed bills of lading and presented them to the master for his signature, and he declined to sign them, for the reason that the quantity of coal on board was stated at 955 tons, the words "more or less," which immediately followed in the printed form, being erased. The master under direction of the owner of the vessel, who was present, declined to sign them, they supposing that they were concluded by the recital of the quantity in the bill of lading, and that they could not recover for any greater quantity, even if delivered by them at the port of destination. The agent after this, presented to the master another set of bills of lading, describing the quantity on board as "955 tons more or less," but with a marginal note, "that the coal was to be weighed at Portland at ship's expense." This set, the master also refused to sign, as such a condition as that in the margin was not customary at Pictou. It was the duty of the master to ascertain the quantity of coal he delivered at Portland, but I think a clause of this kind is not usual, especially in a bill of lading of coal subject to duty, and of which the government without expense to the importer ascertains the quantity, and I do not think that the company had a right to require any such condition to be inserted in the bill of lading.

A bill of lading is not conclusive as to the quantity of goods on board; it is a simple receipt, open to explanation as between the master and the consignee, if owner. The master may, as against such consignee, ordinarily show any mistake as respects the quantity shipped, but in the present case, if the master had executed the first set of bills, which were presented to him, I apprehend he would not have been at liberty to have shown on his arrival, that there were more than 955 tons on board, and he could not have received freight for all he should deliver.

Having decided that there were more than 955 tons on board, I think the master had a right to have his bills of lading so drawn, that they should not be evidence against him, that he had not any more on board, and I therefore think that the more correct bill of lading under all the circumstances was one in the form adopted by the master, and which was executed by him and left at Pictou before the ship sailed, with the agents of the respondent, describing the cargo as "955 tons more or less." That amount was the quantity which respondents' agent claimed to be on board. On the other hand, the master claimed a greater quantity, and as it has turned out, his claim was well founded. A bill of lading reciting that quantity, but so qualified as not to throw the burden of that amount, on the respondent, but leaving it to be determined by the result, was all that the respondents had a right to require, unless it should turn out there

was exactly that precise amount on board, or the master had agreed to be bound by the mines' weight; and I am of the opinion that the master, in executing the bills of lading as he has testified, did all that could be fairly required of him. He thereby furnished the respondents with as accurate a document as he well could, and one which was in accordance with the contract of affreightment. He was entitled to demand freight on all he carried and delivered, and the respondents' agents had no right to insist on a bill of lading evidencing any different agreement. If the master had been truly informed of the precise quantity on board, it would have been his duty to have so stated, but he was not; on the contrary the respondents insisted on there being a much smaller quantity, and that he should so certify by his bill of lading, and that it should be so worded as to conclude him on this question of quantity. They demanded of him a written contract entirely different in its legal effect from that which the original contract justified; they were in my view clearly in the wrong, endeavoring to bind the master to carry 1,042 tons, as and for 955, and to receive pay only on the smaller quantity, which he had never agreed to do.

The bills of lading, executed by the master and left by him with the respondents' agents at Pictou, were all they had a right to require, and it was their duty to have received them and forwarded them to the respondents at Portland. They were the true evidence of the contract as made, allowing the master to receive, and binding the respondents to pay for all the coal shipped and delivered; and they were in such a form, as would at once have been received at the custom house in this city, as the proper ship's document to accompany an entry of the merchandise. The bills of lading, so executed by the master, were not forwarded to Portland, but the two, which the master had declined to execute were forwarded to the respondents' agent here, and when he was notified by the master of his arrival and readiness to deliver the cargo, they were presented to him for signature, and he was required to execute one of them, which he again declined. I think he was fully justified in so doing, and that this demand was quite unreasonable. The cargo was not entered at the custom house until the 4th of Nov., and of course no permit for its discharge could be obtained until that time. The excuse is, that the respondents had not the proper documents with which to enter the cargo, not having any bill of lading executed by the master. If so, whose fault was it? The master, before he sailed, had executed bills in such a form as they had a right to require of him, and they should have been sent to Portland instead of those which were not executed. The master is under no obligation to execute more than one set of bills of lading. It is not only unusual for him to do so, but is quite improper on account of their negotiable character, and danger attending their transfer. The master, notwithstanding the neglect of the respondents to be provided with one part of the bill of lading which he had executed, offered to furnish the respondents' agent with the master's part of the set which he had retained, that they might use it in entering the cargo; but this was unreasonably refused. The difficulty in this case has partly originated from a phrase which has been frequently used in this trial, "the shipper's bill of lading," and which is in a legal point of view quite incorrect. There is in law no such document as a "shipper's bill of lading." No doubt the shipper frequently fills up the blank bill of lading for the master, but it is the master's bill, and not the shipper's, and in law it is presumed to be the act of the master; if accepted by the shipper, then it is of course evidence of the contract as against him; but it is never signed by the shipper, and he had nothing to do with its preparation. It is a document which is required of the master as evidence of his contract, and if it is in accordance with the contract, the shipper is bound to receive it. It is no part of the shipper's duty to prepare it for the master.

The delay in this case from Oct. 25th to Nov. 4th was unreasonable, and without excuse, and I think the respondents are answerable for damages. They, however, should be allowed a reasonable time for entry and payment of duties after the vessel was reported to them. The master made report on Monday, Oct. 26th. I think that they should have been in readiness for discharging the vessel on the morning of Thursday, and I shall allow damages from that time. The permit was obtained the next Wednesday. I allow five days' detention at $50 per day, $250, and balance of freight on 79 tons at $3 per ton, $237; the respondent having brought into court the freight due on 955 tons, which was received by the libellant without prejudice. Decree accordingly.